PERINE (WALTER v.). See Case No. 17,121.

## Case No. 10,982.

### Ex parte PERKINS.

[5 Biss. 254;[1] 8 N. B. R. 56.]

Circuit Court, N. D. Illinois. May, 1873.

ASSIGNEE—REMOVAL — DISCLOSURE TO CREDITORS — DEBTOR PURCHASING CLAIMS TO SET-OFF — EXCUSES —WHAT INSUFFICIENT — REPORTS—REMOVAL—WHEN ORDERED—PRACTICE.

1. It is the duty of an assignee to disclose to the creditors, upon inquiry, and, where it appears they are ignorant thereof, the main facts known to him relating to the condition and assets of the bankrupt estate.

2. Where he knows there is a large sum of money on deposit in a bank, belonging to the estate, against which the bank claimed and were purchasing set-offs, it is his imperative duty to state these facts to creditors inquiring concerning the value of their claims.

3. It is not a sufficient excuse that he could not give definite estimates as to what the estate

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

would pay, or that he says he did not intend to mislead any one. He is presumed to intend the necessary consequences of his own acts, and the concealment of the existence of this large deposit must mislead creditors and affect their action. Nor is it a sufficient answer or excuse that the books of the bankrupt could be examined by the creditors.

4. The assignee should also make, in season, the reports prescribed by the rules in bankruptcy.

5. Where an assignee has failed in properly informing creditors in regard to their rights and the value of the assets, and the information has been suppressed in the interest of one class of creditors, it is the duty of the court to remove him.

6. On a revisory petition to the circuit court, the proper practice is to direct the district court to remove the assignee and to appoint some other competent person in his place.

This was a petition by John A. King and Newton S. Taylor, creditors of the State Insurance Company, bankrupt, filed under the second section of the bankrupt act, to review an order of the district court refusing to remove Norman C. Perkins, assignee of the State Insurance Company of Chicago, bankrupt. This corporation, organized under the general law of the state of Illinois, and doing business in the city of Chicago up to the 9th day of October, 1871, sustained such losses on that day that it became insolvent and suspended business. On the 2d of November the attorney-general of the state commenced proceedings in the circuit court of Cook county to wind up the corporation under the statute of the state, in which proceedings Horace A. Hurlburt, the president of the company, was appointed receiver, George C. Smith, president of the bank and treasurer of the insurance company, and his brother, Charles M. Smith, vice-president of the bank and vice-president of the insurance company, signing his bond. On the 8th of December following, a petition in bankruptcy was filed against the company in the district court of the United States for this district, under which the company was, on the 12th of January, 1872, adjudicated a bankrupt by default. No schedule or inventory was filed until the 17th of February, 1873. At the time of the fire, October 9, 1871, the company had in the hands of George C. Smith, its treasurer, on deposit in the National Loan & Trust Company, a bank of which he was president, the sum of sixty thousand dollars in cash, good mortgages to the amount of about one hundred thousand dollars and also United States government bonds of the value of two ·hundred thousand dollars. These bonds were, at that time, in New York City, but soon afterwards were, by Smith's order, converted into cash, and the proceeds deposited in this bank. The losses of the company by the fire were between $600,000 and $700,000. The books of the company were in the hands of the treasurer, and were not exhibited to any outside persons, and the reports ordinarily given of the liabilities and assets of the company by its officers and those winding up its affairs, were that the losses were about ten times its assets. Immediately after the fire the bank commenced buying up the proofs of loss as filed against the company, at the rate of ten per cent. on their face, for the purpose of offsetting them against the funds on hand. By the 1st of December they had purchased claims to the amount of two hundred and sixty thousand dollars, upon which they issued certificates of indebtedness in the name of the company, to J. Bradner Smith, and brother of George C. Smith and Charles M. Smith, which certificates were taken to the National Loan & Trust Company Bank and charged up at their face against the deposit of the company. The policies and proofs of loss upon which these certificates were issued were left in the office of the company as taken up, and canceled. The balance still in the bank to the credit of the company was further diminished by deductions for salaries paid, and retaining fees of counsel, and loans to the amount of about twenty thousand dollars, and a further charge was made of forty-two thousand dollars for stock of the insurance company which the bank had bought before the fire. In the schedules all the policy-holders were returned as creditors of the company, but not J. Bradner Smith, to whom the certificates of indebtedness had been issued, nor the National Loan & Trust Company, which had purchased them. The cash on hand was stated at $17,779.33, being the amount of the deposit in the bank after deducting all charges made against it. The other assets were returned as bills, notes and other securities to the amount of about one hundred and twenty-five thousand dollars. At the election on the 12th of April, Norman C. Perkins, who had previously been the attorney for both the bank and insurance company, was elected assignee by an almost unanimous vote. Shufeldt & Ball, the brokers through whom the bank had purchased the claims against the company, casting all their votes for him; and on the 15th of the same month he was confirmed by the district court, and gave bond in the sum of one hundred thousand dollars, with Charles M. Smith and J. Bradner Smith as sureties. No attempt was ever made by Perkins to recover from the bank the money or securities in its hands, except the balance of $17,779.33; nor to dispute the charges made by the bank against its deposits; nor was any report or statement ever made by him that the bank was indebted to the company, or that the company ever had assets in the hands of the bank above that amount, or any claim against the bank in any way. On the 12th of July of the same year, a petition for the removal of Mr. Perkins as assignee was filed in the bankruptcy proceedings by Newton S. Taylor, a creditor of the bankrupt, and subsequently various other petitions, additional and supplemental, were filed for the same purpose. The principal causes of complaint against the assignee in these petitions were

the receiving of four hundred dollars for services rendered the bankrupt as counsel, which was claimed to be a preference under the bankrupt law, and also the settlement, at too small an amount, of a claim of re-insurance against the Teutonia Insurance Company of Cleveland, Ohio; and principally, that in his conduct as assignee he had suppressed from the creditors of the bankrupt, material facts in relation to the affairs of the company and its assets, particularly the transactions of the bank and its officers, and the large deposit and securities in their hands, which, it was claimed, he should, in good faith, have communicated to them. Upon these petitions, the answers of the assignee and proof taken before the register, the district court refused to grant the prayer of the petitioners and to remove the assignee. Thereupon this petition for review was filed in the circuit court, under the second section of the bankrupt law.

Cooper. Garnet & Packard, for petitioner, cited as to what were sufficient grounds for removing assignee: Ex parte Stagg. 2 Mont. D. & D. 186; In re Burton, Id.; Ex parte Molineux, 1 Deac. 603; In re Keat, Id.; Ex parte Ashmore, 3 Mont. D. & D. 461; In re Lucas, Id.; Ex parte Carter, 3 De Gex & J. 116; In re Robinson, Id.; Ex parte Perryer, 1 Mont. D. & D. 276; In re Innes, Id.; Ex parte Leman, 13 Ves. 271; Ex parte Copeland, 3 Deac. & C. 561; In re Weston, Id.; Ex parte Shaw, 1 Glyn & J. 127, 156; In re Howard, Id.; In re Morse [Case No. 9,852].

Sidney Smith, for assignee.

DRUMMOND, Circuit Judge. I shall discuss but one of the points made in the petition, viz.: that when application was from time to time made to the assignee by creditors of the company, the very object of which it must have been apparent was to ascertain the condition of the company, he suppressed facts which were within his knowledge, and which it was his duty to communicate. I will proceed to state very briefly the reason why I think this information was suppressed, and why it was his duty to communicate it.

We have to assume that the creditors thus inquiring of the assignee as to the condition of the assets of this company, were claimants against those assets, and were inquiring as to their own property. Now, I am aware that it is no uncommon thing for an assignee to be annoyed by numerous applications and inquiries about the affairs of a bankrupt, and I make all due allowance for the natural impatience which might thus be created. If that were all of which complaint could be made against this assignee, the court would not interfere with the ruling of the district court; but this was not all. The books of the company came into his possession, according to his own statement, about the 2d or 3d of May, 1872. These books show certain facts,

and the court will presume that the assignee, at the time or shortly after these books came into his possession, knew them, some of which were these: That the principal managers of the State Insurance Company and of the National Loan & Trust Company were the same; that George C. Smith was the treasurer of the company and president of the bank; and that, at the time of the insolvency of the company, there was on deposit with the National Loan & Trust Company to the credit of the company over three hundred thousand dollars; that, between the date of the insolvency of the company and the time when the books came into the possession of the assignee, and he became acquainted with their contents, the parties who had the management, to a greater or less extent, both of the insurance company and the bank, had been concerned in purchasing claims against the insurance company with a view to set off those claims against this deposit account, and I may add, he knew that these purchases were made under circumstances which showed that the parties purchasing were endeavoring to depreciate the value of the claims against the company with a view of obtaining them for less than their value.

These are facts which were known to the assignee, or ought to have been known to him, immediately after the books came into his possession. One leading fact to which I have adverted was this: That there was on deposit to the credit of the company the sum of over three hundred thousand dollars. Another fact that he knew was that Mr. Hurlburt, as the receiver under the appointment of the state court, did not set up any claim to this large deposit.

Whatever view may be entertained of the right of a debtor of a bankrupt corporation to go into the market and purchase claims against that corporation for the purpose of setting them off against his own debt, having knowledge, at the time that he makes the purchase, of the bankruptcy of the corporation, about which members of the profession and judges may differ (though this court, on the 5th of June last, decided that, under such a state of facts, the set-off could not be allowed. See Drake v. Rollo [Case No. 4,066]; Hitchcock v. Rollo [Id. 6,535]; Sawyer v. Hoag [Id. 12,400]), there can be no doubt, in my opinion, that, under the circumstances connected with the deposit in the National Loan & Trust Company and the purchase of the claims against the insurance company with a view to set them off against the deposit account, a court of equity would never allow such a set-off, obtained by parties occupying a fiduciary relation to the company, and so connected with the bank, and possessing knowledge that no other parties possessed.

Now, this assignee, whatever might be his opinion as to the set-off, must be presumed to know the facts under which the set-off

was sought to be made. Possessing this knowledge, let us see what he did, and what he omitted to do, when application was made to him by various parties who had a right to know some of these facts. For instance, Mr. Millard testifies that about July 1st, 1872, ten days before the first petition was filed, he called on Mr. Perkins in relation to the purchase of claims which he represented. Mr. Perkins referred him to Mr. Truman, who was in the office. The witness asked if Truman was buying up the policies. Truman said he was, and was paying thirteen cents for them. Afterwards he called upon Mr. Truman, and he said he was paying seventeen cents.

Now, there was a person who called upon the assignee, the very object of whose call, it must have been known, was to ascertain something about the value of the policies, and of the claim which he had against the company.

Mr. Thomas testifies that an application was made by him to the same effect as that made by Mr. Millard. The assignee told him he could not purchase the claim himself, but he knew a party who was purchasing. The assignee asked how much had been offered for the claim and he told him twelve and a half per cent. The assignee gave the impression, "It was worth, he thought, something more than that, but don't think he mentioned any figures."

T. W. Brophy testifies that about the 18th of May, he had an interview with Mr. Perkins in reference to a claim. The assignee said he did not know what the company could pay; that many policies could be bought for ten cents on a dollar; he had sold his for that, but did not know whether more could be realized or not. The assets of the company consisted of some mortgages —"don't know whether he said it had any bonds or not; don't remember as he said anything about that; think that was all." The mortgages were on buildings that had been destroyed.

Newton S. Taylor testifies that he called on the assignee the last of May, or the 1st of June, to ascertain what the prospects were for receiving anything from the company; that he asked the assignee what the assets of the company were; that the assignee replied that there was a bond of thirty thousand dollars which he thought was good, and a few mortgages,—one of five thousand dollars on the North side which he thought wasn't good; that the assignee represented nothing else. He asked the assignee when any dividends would be declared, and he replied that if there were any it would be very late in the fall—probably not until spring.

George Gardner testifies that he called on the assignee some time in July stating that he called to obtain information about the affairs of the company. The assignee in substance replied that the company "was in a pretty bad box, didn't amount to much, and wouldn't pay a great deal;" the witness did not enquire about the specific assets of the company, nor did the assignee state; nothing was said by either party about any funds on deposit in the National Loan & Trust Company Bank.

These are statements made by various parties purporting to have, and who, it is not disputed, did have, claims against this bankrupt insurance company, who called upon the assignee at the various times mentioned, for the purpose of obtaining information of its affairs.

Now, it is extraordinary that with the knowledge of the assignee of the fact—that there was or had been on deposit over three hundred thousand dollars to the credit of the company—it was not communicated to any one of these parties making inquiries. It certainly was a fact calculated greatly to affect their interests and their subsequent conduct in relation to their various claims. It was a fact that had a very important bearing upon the value of the claims, as they then existed, in the market.

If we concede that the assignee knew of the claim of set-off and believed that claim was well founded, still it is singular that in not one of these instances did he communicate so important a fact. It was for these various creditors to judge of the legal effect of that fact and to determine what their conduct would be. If it was not necessary for the assignee to go into any general details about the character of the claims, still I must insist that it is not possible to explain his silence in relation to this large deposit consistently with what I conceive to be entire fair dealing to the creditors who were inquiring about what belonged to them. The assignee had no further interest in them than what he might receive as compensation for administering them. The true course was to state this fact and say that the value of the assets might very much depend upon the validity of the claim of the bank against the deposit account as a set-off, and leave the parties to judge for themselves.

It is clear that many of the parties did not know of the existence of this fact, and it is also clear that several of these interviews took place after the decision of the court in relation to the general law of set-off, on the 5th of June, 1872.

It cannot be said that the assignee did not disclose this fact because it was notorious. It certainly was not known to most of these applicants, even if to any of them. I think the duty was the more imperative upon the assignee to make this disclosure, because of the proceedings in the state court under the state law to wind up the company, the appointment of the receiver, and report that he had only a little more than seventeen thousand dollars in his hands.

But the assignee has a right to be heard as to his own conduct. Let us examine and see what his account is when being examined as to whether he communicated this principal fact to any of these creditors.

This question is put to him:

"Q. Did you report the fact of these moneys in the National Loan & Trust Company Bank to any of the creditors before the 12th of July, and, if so, to whom,—any creditors of the insurance company?"

That is a plain, distinct question as to a matter within his personal knowledge, and which admitted of a distinct answer, and this is the answer:

"A. I don't know that I had any occasion to make any report to any of the creditors concerning the particulars. I answered questions as they asked them of me."

He is asked as to a fact, and he says that he does not know that he had any occasion to make any report, and that he answered questions as they were asked.

Then this question was put:

"Did you make a report to any of the creditors before the 12th of July, and before King & Taylor's petition was filed?

"A. I made no report to any creditor concerned. 1 made no report until the second creditors' meeting. I answered questions and gave such information as I was able to from time to time."

Then this question is put to him:

"Q. Did you ever give any information to any creditor, before the 12th of July, of the moneys on deposit in the National Loan & Trust Company Bank? If so, to whom?"

A very clear question, admitting of a distinct answer,—and what is the answer?

"A. I never made reports to any. I answered questions asked me, and gave information required of me."

The next question is this:

"Q. Was that question ever asked you,—that is, as to the deposit in the National Loan & Trust Company Bank?"

The answer is: "I don't think it ever was."

"Q. And you never volunteered the information to any creditors?

"A. I don't know I had any occasion to say anything to any creditor you represent."

Now, I think this testimony is not fair, candid, nor creditable to the assignee. I have already said, and I now repeat, that it was the imperative duty of the assignee to disclose this fact to the parties who made the application; that good faith required him to do it, and that he was not acting fairly to the creditors when he refused or declined to make the disclosure, and it is impossible to avoid asking the question whether, if this had been a deposit account in a bank managed by persons or parties who had not elected him assignee, and with whom his associations, personal and professional, had not been more or less intimate, he would have refused to make the disclosure.

Let us examine a little further the testimony of Mr. Perkins, in order to form an opinion as to his own view of his conduct. He says: "At the outset I consider that if I should give people estimates and conjectures as to what must be uncertain—the amount finally paid—I should certainly mislead some, and subject myself to blame, and I accordingly resolved to make no such estimates to any person; and I never have. Mr. Gardner mentions in his testimony that he had been previously told, by other persons, that the company would not pay more than ten or twelve cents, and he may have mentioned those figures in our interview. Likely enough he did; and, if he did, I probably did not contradict him."

Now, no one pretends that it was the duty of the assignee to state how much the assets of the company would pay, for that depended upon circumstances not within his knowledge. That is not the question. It is not that he did not state how much the assets of the company would pay, but that he did not state a fact which would constitute an all-important element in the calculation as to how much the company might pay, and thus leave creditors to determine for themselves, having knowledge of that fact, how much it would probably pay. When he says Mr. Gardner "may have mentioned those figures in our interview; * * * and, if he did, I probably didn't contradict him,"—is he not condemning himself by thus admitting that he did not disclose this fact to those who had an absolute right to be informed of it?

But, let us hear him further:

"2. Was there any reason to contradict him?"

"A. I should have no reason to. I abstained conscientiously and invariably from making figures, or giving figures to anybody, in reference to the matter, and have until the present time."

"Q. Now, sir, have you either to Mr. Gardner, or anybody else, said anything or done anything to mislead them in relation to the value of their claims?"

"A. I certainly have not intended to. It is impossible for me to tell what effect the interviews with me have had. I have not had the intention to mislead anyone."

A man must intend—such is the rule of morals, of law, and of common sense—the necessary consequences of his own acts; and when the assignee says that he did not intend to mislead anyone, he, as a man of intelligence, must know that no one can avoid the conclusion that his conduct was of such a character as necessarily to produce that result,—that such was the legitimate effect of his conduct, not, perhaps, by a deliberate misstatement, but by the suppression of a fact within his knowledge, and which it was his duty to communicate to the parties.

The assignee afterwards gives a further ex-

planation when this question was put to him.

"Q. Now, then, Mr. Perkins. I want you to explain, if you have any explanation to give, why it was you didn't explain to them something about this large amount of money on deposit in the National Loan & Trust Company Bank?"

A very natural question, and one which would seem, to an indifferent person, to require some sort of an explanation. The answer is:

"A. I didn't undertake to take every creditor who came in, and explain to him at length everything I had in my hands, from which I expected to realize anything. If I had, I would be able to do nothing else, for a great many people came there. My time was fully occupied in attending to the affairs of the company, which needed immediate and constant attention, and I didn't undertake to, nor did I regard it as my duty, to go over with every man who came in there and asked me a question, a long statement of what I had got on hand and expected to receive, or to go into conjectures of what the company would probably pay. I didn't regard that as my business. I answered very cheerfully and fully all questions asked of me, and gave every information I knew anybody wanted so far as I could."

Now, is that exactly true? Certainly, the fact that there were over three hundred thousand dollars on deposit in the National Loan & Trust Company Bank was information that the creditors of the bankrupt company would have been very glad to obtain. That information was certainly wanted. That information was not communicated.

It may be said that the books were at the disposition of, and could be examined by, the creditors. That may be true. I suppose that any of the creditors could have examined these books, either upon application to the assignee or to the court. But the fact that the creditors had the power to examine books constitutes no reason why the assignee, under the circumstances which have been mentioned, should suppress a fact so material, and which was within his knowledge, and which he must have known was not within the knowledge of the applicants.

I make no comment upon a great deal in the testimony of the assignee, which exhibits a flippancy entirely out of character with the investigation and subject of inquiry, and which, to say the least, is a violation of good taste.

There are many objections to the removal of this assignee, and it is with some hesitation that I have come to the conclusion that he must be removed. He has become familiar with the business of the bankrupt company; he is a man of intelligence, and is, probably, in many respects, considering the knowledge he possesses of its affairs, especially well qualified to go on and finish up the administration of its assets; but I have felt it impossible to pass over his conduct, under the circumstances which have been mentioned, and where, as I think, he suppressed information that he ought to have communicated.

I feel that he was not acting under that rule which is the only safe rule for men in their transactions with each other; that he was not doing to these creditors as he would have required any one of them to do to him, under similar circumstances. Therefore, I cannot excuse or pass by such an omission as I find actually existed in this case.

It is not disputed that the assignee did not comply with the rule of the supreme court of the United States, made at the December term, 1871, relative to the reports of assignees. The assignee himself admits this, and one of the reasons given for non-compliance is that he was not aware of the existence of the rule. But he also admits that in July he knew such a rule had been made, and yet there was no report made by him, either to the register or to the court, until about the 1st of September, 1872.

I only refer to this, without laying any great stress upon it, although he might and ought to have made a report earlier than he did. It is not on that ground that the court acts.

I am aware of the objections to the appointment of another assignee, but other considerations influence me, independent of what I have already stated. It is clear, although the assignee does not admit, but disavows it, that there is such a feeling in his own mind for some of the creditors of this company, and against others, that his conduct is influenced, and has been, and may be again, by these feelings.

It is also clear that a large and respectable portion of the creditors of this company entertain such feelings toward the assignee, that they have no confidence in his administration of the assets of the company, and without saying that they are justified in all the sentiments of hostility which they entertain toward him, it is apparent, from what the court has already said, that in its opinion their hostility is, to some extent at least, justified by the facts.

Taking all these circumstances together, in my opinion, the best interests of all parties who have any claims against this company will be promoted by having some one else act in place of the present assignee.

It has been somewhat a question with the court, whether it is the duty of the circuit court to appoint the assignee, but the conclusion arrived at is that the court must remit the matter to the district court, requiring that court to remove the assignee, and to appoint another in his place.

The order of the court will therefore be that the district court be required to remove the assignee, and to appoint another competent person in his place.